**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


DEBORAH COONTZ,              )      CASE NO.  5:11-cv-1164
                              )
          Plaintiff,       )
                              )      MAGISTRATE JUDGE
        v.                )      VECCHIARELLI
                              )
MICHAEL J. ASTRUE,       )
      Commissioner of Social Security,   )
                              )      **MEMORANDUM OPINION AND**
          Defendant.     )      **ORDER**

Plaintiff, Deborah Coontz ("Plaintiff"), challenges the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying Plaintiff's applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.   PROCEDURAL HISTORY

On September 28, 2006, Plaintiff filed applications for a POD, DIB, and SSI and alleged a disability onset date of June 28, 2006.  (Tr. 15.)  The applications were denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 15.)  On June 25, 2009, an ALJ held Plaintiff's hearing.  (Tr. 15.)  Plaintiff appeared, was represented by counsel, and testified.  (Tr. 15.)  A vocational expert also appeared and testified.  (Tr. 15.)  On September 30, 2009, the ALJ found Plaintiff not disabled.[1]  (Tr. 30.)  On April 27, 2011, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)

On June 7, 2011, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  On December 3, 2011, Plaintiff filed her Brief on the Merits.  (Doc. No. 17.)  On January 31, 2012, the Commissioner filed his Brief on the Merits.  (Doc. No. 19.)  Plaintiff did not file a brief in reply.

Plaintiff asserts two assignments of error:  (1) the ALJ improperly assessed the opinions of her treating physicians; and (2) the ALJ improperly assessed her fibromyalgia.

---

[1] The ALJ observed that Plaintiff had filed prior applications for a POD, DIB, and SSI; a prior ALJ had found Plaintiff not disabled as of November 22, 2005; and there was no evidence that Plaintiff appealed that decision.  (Tr. 15.)  The ALJ found that she was not bound by the prior ALJ's decision because less than four years elapsed between the prior decision and Plaintiff's applications for disability benefits in this case; Plaintiff's alleged disability onset date in this case post-dated the prior decision; and the record contained new and material evidence of Plaintiff's condition.  (Tr. 16.)  Plaintiff has not taken issue with the ALJ's findings regarding the prior decision.

2

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was 42 years old on her alleged disability onset date.  (Tr. 28.)  She had at least a high school education and was able to communicate in English.  (Tr. 28.) She had past relevant work experience as a fast food worker.  (Tr. 28.)

### B.    Relevant Medical Evidence

It is not disputed that Plaintiff suffers multiple physical and mental impairments. Plaintiff's assignments of error, however, relate only to her pain and fatigue, particularly related to her fibromyalgia; accordingly, the following summary of medical evidence will be limited to those impairments.

On July 28, 2005, Dr. Selwyn-Lloyd McPherson, M.D., authored a medical source statement and indicated the following.  (Tr. 525-26.)  Plaintiff had a history of chronic back pain.  (Tr. 525.)  Her sitting, standing, and walking were affected by her condition, although Dr. McPherson did not explain to what extent.  (Tr. 526.)  Plaintiff was moderately limited in her abilities to push and pull; not significantly limited in her ability to bend; and otherwise had no limitations.  (Tr. 526.)  Nevertheless, Plaintiff was unemployable for less than 30 days.  (Tr. 526.)

On December 13, 2005, Plaintiff presented to Dr. McPherson for a neuroligic/ neuromuscular re-assessment.  (Tr. 286.)  Dr. McPherson indicated that Plaintiff reported the following.  Plaintiff continued to complain of back, neck, and upper extremity pain.  (Tr. 286.)  A combination of a Duragesic Patch, Soma, and Percocet relieved most of her pain; however, her pain occasionally increased, particularly with

3

changes in the weather.  (Tr. 286.)  Dr. McPherson indicated that nerve conduction

studies and a needle EMG of Plaintiff's upper extremities were normal.  (Tr. 286.)  Dr.

McPherson diagnosed Plaintiff with degenerative disc disease in the lumbar and

cervical spine, a bulging disc in the lumbar spine, lateral epicondylitis, and right carpal

tunnel syndrome.  (Tr. 286.)

On January 26, 2006, Dr. Sang M. Leu, M.D., authored a medical source

statement and indicated the following.  (Tr. 529-30.)  Plaintiff suffered lumbar

degenerative disc disease, a bulging disc, fibromyalgia, and irritable bowel syndrome.

(Tr. 529, 530.)  Plaintiff was unemployable for between 30 days and 2 months;

however, Dr. Leu did not provide any information regarding the extent to which Plaintiff

was limited.  (*See* Tr. 529-30.)

On February 13, 2006, Plaintiff presented to Dr. Bina Mehta, M.D., for an

evaluation of her "all-over body pain."  (Tr. 352.)  Dr. Mehta indicated that Plaintiff

reported the following.  Plaintiff suffered constant aching in her neck, back, arms,

knees, ankles, and hands; and numbness and tingling in her hands and feet.  (Tr. 352.)

She rated her pain at 6 on a scale to 10 in severity.  (Tr. 352.)  The pain was

exacerbated by activities including standing, sitting, walking, pushing, pulling, climbing,

and grasping; and the pain eased with activities including lying down.  (Tr. 352.)  The

pain interfered with her ability to sleep.  (Tr. 353.)

Upon physical examination, Dr. Mehta indicated the following.  Plaintiff could rise

independently from a sitting position, and her gait was normal.  (Tr. 353.)  She was

tender to palpation over the cervical paravertebral muscles, bilateral trapezii, left

forearm, forehead, left knee, bilateral hips, and left "SI."  (Tr. 353.)  Dr. Mehta

4

diagnosed Plaintiff with fibromyalgia and chronic pain.  (Tr. 354.)

On April 19, 2006, Plaintiff presented to Dr. David H. Krahe, D.O., for an orthopedic consultation regarding her low back pain.  (Tr. 278.)  Dr. Krahe indicated the following.  Plaintiff complained of constant pain and intermittent paresthesias in her left leg.  (Tr. 278.)  She denied any other complaints.  (Tr. 278.)  Upon examination and based on Plaintiff's "history of MRI," Dr. Krahe was of the impression that Plaintiff suffered low back pain with a herniated disk.  (Tr. 278.)  Dr. Krahe recommended that Plaintiff continue to take Mobic and Neurontin and start physical therapy.  (Tr. 278.)

On November 7, 2006, Plaintiff presented to Dr. Ronald C. Mineo, D.O., for a follow-up on her right elbow pain.  (Tr. 434.)  Dr. Mineo indicated the following.  Plaintiff also complained of mild pain in her left elbow.  (Tr. 434.)  Dr. Mineo was of the impression that Plaintiff suffered bilateral lateral epicondylitis that was "much worse" on the right, as well as multiple joint complaints.  (Tr. 434.)  A prior injection in her right elbow "helped" Plaintiff.  (Tr. 434.)  Dr. Mineo gave Plaintiff an additional injection and recommended that Plaintiff continue to use a counterforce brace and perform her home exercise program.  (Tr. 434.)

On February 12, 2007, Dr. Leu authored another medical source statement and indicated the following.  (Tr. 523-24.)  Plaintiff suffered a variety of conditions including fibromyalgia.  (Tr. 523.)  She was unemployable for 12 months or more; however, Dr. Leu did not provide any information regarding the extent to which Plaintiff was limited. (*See* Tr. 524.)

In March 2007, Plaintiff was discharged from physical therapy with Dr. Mineo. (Tr. 561.)  The physical therapist, Mr. Ryan Tessean, performed a Physical Work

Performance Examination and indicated the following.  (*See* Tr. 565-71.)  Plaintiff could

perform work at the medium exertion level.  (Tr. 565.)  Plaintiff gave full physical effort;

her self-limiting behaviors were within normal limits.  (Tr. 565, 569.)

On June 26, 2007, Plaintiff presented to Dr. Jim P. Bressi, D.O., for an

evaluation of her back pain that radiated into her left hip; sharp pain between her

shoulders; achiness and stiffness in her knees; and pain in her elbows.  (Tr. 710.)  Dr.

Bressi indicated that Plaintiff reported the following.  Plaintiff rated her pain at 7 on a

scale to 10 in severity; at its best, her pain was at 5 on a scale to 10 and at its worst, it

was at 10.  (Tr. 711.)  Cold weather, lifting objects, and sitting or standing for too long

made her pain worse.  (Tr. 711.)  Resting, medication, and stretching exercises helped

relieve her pain.  (Tr. 711.)  Her fibromyalgia flare-ups did not last for more than 48

hours.  (Tr. 711.)  She had been learning to avoid certain activities that caused an

increase in her pain.  (Tr. 711.)

Plaintiff was taking Neurontin, Mobic, and Zanaflex.  (Tr. 711.)  She took Toradol

when her pain became severe.  (Tr. 711.)  The Toradol, as well as Vicodin, provided

some relief of her pain without any side effects.  (Tr. 711.)  The Neurontin, as well as

Lyrica, caused blurry vision, swelling, and dizziness.  (Tr. 711.)  She tried Duragesic,

but it caused gastro-intestinal problems.  (Tr. 711.)  She tried Soma, but it made her

feel "like a zombie" and did not provide relief.  (Tr. 711.)  She tried Morphine, but she

became "very violent" while on it.  (Tr. 711.)  Ultracet and Ultram made her skin itch.

(Tr. 711.)  She also tried Elavil and Wellbutrin, but they caused her mood to change

and caused gastro-intestinal problems.  (Tr. 711.)

Upon physical examination, Dr. Bressi indicated the following.  Plaintiff appeared

to be in "moderate discomfort."  (Tr. 712.)  She was positive for 15 out of 18 tender points; the most painful areas were in her chest wall, trapezii, and behind her knees. (Tr. 712.)  However, she walked with a normal gait and had good balance; she had good strength in her upper right extremity; she had an excellent grip; and she was negative for atrophy.  (Tr. 712.)  Dr. Bressi assessed Plaintiff with cervical disc degeneration, thoracic degeneration, lumbosacral degeneration, lumbosacral radiculitis, and fibromyalgia.  (Tr. 712.)  Dr. Bressi indicated that he would take Plaintiff off Neurontin, start her on Lyrica and Percocet, continue her on Zanaflex and Mobic, and schedule her for epidural injections.  (Tr. 712.)

On October 4, 2007, Plaintiff presented to Dr. Robert Geiger, M.D., for a follow-up on her "chronic global body" pain, particularly her low back pain.  (Tr. 914.)  Dr. Geiger indicated the following.  Plaintiff reported that her pain was centered in her low back and radiated into her lower extremities, and that she suffered multiple fibromyalgia tender points and fatigue.  (Tr. 914-15.)  Nevertheless, Plaintiff "state[d] that overall pain [was] adequately controlled at [that] time."  (Tr. 914.)  Dr. Geiger further indicated that although Plaintiff was "[f]ailing to change as expected," her "quality of life ha[d] improved secondary to pain meds" and she was able to perform activities of daily living. (Tr. 915.)

On October 30, 2008, Plaintiff underwent another Physical Work Performance Evaluation with Mr. Tessean.  (Tr. 948.)  Mr. Tessean indicated the following.  Plaintiff could perform a light range of work.  (Tr. 948.)  However, light work was the minimum that Plaintiff could perform, as Plaintiff's self-limiting behavior prevented Mr. Tessean from determining the maximum range of work Plaintiff could perform.  (Tr. 948.)

7

Regardless of Plaintiff's self-limiting behavior, Mr. Tessean indicated that Plaintiff would be able to alternate among standing, walking, and performing other tasks.  (Tr. 948.)

On November 9, 2007, Plaintiff presented to Dr. Inderprit Singh, M.D., for an evaluation of her fibromyalgia.  (Tr. 830-32.)  Dr. Singh indicated that, "[a]s far as the fibromyalgia, [Plaintiff] is presently stable on the current medication course."  (Tr. 830.)

On February 26, 2008, Dr. O. Kap Kwon, M.D., completed a medical source statement and indicated the following.  (Tr. 771-72.)  Plaintiff could sit, stand, and walk for 30 minutes in an 8-hour workday, and for 30 minutes at a time without interruption.  (Tr. 772.)  She was markedly limited in her abilities to push, pull, reach, and perform repetitive foot movements.  (Tr. 772.)  She was moderately limited in her ability to bend.  (Tr. 772.)  Plaintiff was unable to work continuously because her arms became swollen, and because her back pain and leg pain became worse.  (Tr. 772.)  Plaintiff's condition could be expected to last for 12 months or more.  (Tr. 772.)

On April 8, 2008, Plaintiff presented to Dr. Bressi for a follow-up on her chronic low back and lower left extremity pain.  (Tr. 920-21.)  Dr. Bressi indicated that Plaintiff "stated that overall pain is moderately controlled with current analgesic regimen" and "deni[ed] any side effects or adverse effects from these medications."  (Tr. 920.)  Dr. Bressi further indicated that Plaintiff's "quality of life has improved secondary to pain meds," and that Plaintiff was able to perform activities of daily living.  (Tr. 922.)

On June 25, 2008, Plaintiff presented to Dr. Geiger and complained of back and lower extremity pain that, on some days, render her "almost completely unable to walk." (Tr. 923.)  Nevertheless, Dr. Geiger indicated that Plaintiff was stable, felt "adequate analgesia" and was able to perform activities of daily living; and that Plaintiff's quality of

8

life had improved secondary to her pain medication.  (Tr. 924.)

On August 14, 2008, Plaintiff presented to Dr. Singh and complained of a low-grade temperature for the last three weeks.  (Tr. 1066.)  Dr. Singh indicated that Plaintiff also continued to complain of joint pain, but that her fibromyalgia was stable. (Tr. 1066-67.)

On September 26, 2008, Dr. Kwon completed a medical source statement regarding Plaintiff's physical capacity and indicated the following.  (Tr. 836-37.)  Plaintiff suffered "severe" pain.  (Tr. 837.)  She could lift and carry a maximum of 10 pounds occasionally.  (Tr. 836.)  She could sit for 6 hours total in an 8-hour workday and for half an hour without interruption.  (Tr. 836.)  She could stand and walk for 2 to 3 hours total in an 8-hour workday and for one quarter of an hour without interruption.  (Tr. 836.) She could rarely or never climb and crawl; occasionally or rarely stoop, crouch, or kneel; and occasionally balance.  (Tr. 837.)  She could rarely or never push and pull; occasionally or rarely reach; occasionally handle; frequently or occasionally feel; and frequently perform fine and gross manipulation.  (Tr. 837.)  She needed breaks in addition to morning, lunch, and afternoon breaks (Tr. 836), and she required an at-will sit/stand option (Tr. 837).

On November 6, 2008, Plaintiff presented to Dr. Singh and complained of a worsening in her fibromyalgia.  (Tr. 1064.)  Dr. Singh indicated the following.  Plaintiff's fibromyalgia was stable.  (Tr. 1065.)  He had not perform a functional evaluation of Plaintiff and would defer such an evaluation for the pain physician who was managing her degenerative disc disease because he believed that the degenerative disc disease was "most likely the underlying cause of [Plaintiff's] inability to work."  (Tr. 1065.)

On December 2, 2008, Plaintiff presented to Dr. Thomas Robb, D.O., for a "psychiatric visit."  (Tr. 1056.)  Dr. Robb indicated that Plaintiff reported she had months in which she slept for only three hours and cleaned with "extra high energy"; and that presently she was tired in the daytime and slept a lot.  (Tr. 1056.)

On January 29, 2009, Plaintiff presented to Dr. Singh with complaints of severe neck and back pain.  (Tr. 1062.)  Dr. Singh indicated that Plaintiff reported the following. Plaintiff's back pain was persistent, and Plaintiff suffered prolonged stiffness in the morning.  (Tr. 1062.)  She suffered persistent insomnia and slept often throughout the day.  (Tr. 1062.)  Dr. Singh indicated that he believed Plaintiff's Lyrica, Zanaflex, and Clonidine possibly caused her insomnia (Tr. 1062); and that Plaintiff's morning stiffness probably was caused by her medication rather than her depression or fibromyalgia (Tr. 1063).

Also on January 29, 2009, Plaintiff presented to Dr. Bressi.  (Tr. 1025-27.)  Dr. Bressi indicated that Plaintiff reported the following.  Plaintiff rated her pain at 9 out of 10 in severity, but her fatigue was her most disabling condition.  (Tr. 1026.)  She slept all night and wanted to sleep all day.  (Tr. 1026.)  Dr. Bressi assessed Plaintiff with fibromyalgia "with probable chronic fatigue" and opined that "due to the fatigue history she would not have the stamina to fulfill any job requirements . . . even part-time sedentary."  (Tr. 1026.)

On March 12, 2009, Plaintiff presented to Dr. Singh for a follow-up.  (Tr. 1119.) Dr. Singh indicated the that Plaintiff complained of "significant distress and fatigue." (Tr. 1119.)  Dr. Singh agreed with the "pain management assessment" that Plaintiff "will be unable to be functional in any job in any capacity considering her fatigue."  (Tr.

10

1120.)  Dr. Singh continued that Plaintiff's "fatigue could be secondary to her multiple medications or from a depression or she could just be suffering from chronic fatigue syndrome."  (Tr. 1120.)

On March 27, 2009, Plaintiff presented to Dr. Geiger for a follow-up.  (Tr. 1105.) Dr. Geiger indicated that Plaintiff reported the following.  Plaintiff's pain included hip pain that, for the past two weeks, occasionally inhibited Plaintiff's ability to walk.  (Tr. 1105.)  Plaintiff attributed the worsening of her pain and ability to walk to the cold and wet weather.  (Tr. 1105.)

On May 14, 2009, Dr. Singh diagnosed Plaintiff with fibromyalgia "with prominent component of debilitating fatigue," although Plaintiff's condition "[p]resently seems to be somewhat under control."  (Tr. 1118.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Plaintiff testified at her hearing as follows.  Plaintiff last worked on December 8, 2004, at a fast food restaurant.  (Tr. 39.)  She stopped working upon taking medical leave to undergo a hysterectomy.  (Tr. 39-40.)  She lost her job because her medical leave was too long.  (*See* Tr. 40.)  By May of 2005, she began submitting applications for other fast food jobs.  (Tr. 40.)  Many of the restaurants did not respond to her applications.  (Tr. 45.)  She needed a medical release to obtain a new job at her prior employer's restaurant, but her doctors (Drs. McPherson, Eggle, and Leu) told her they did not believe she should return to work.  (Tr. 40-43.)  Dr. Leu told Plaintiff that she

should not return to work because her fibromyalgia might flare up.[2]  (Tr. 44.)

Plaintiff participated in household chores only "a little bit."  (Tr. 47.)  Her children did the laundry.  (Tr. 46.)  She could fold clothes "a little bit," and she could wash dishes if she sat.  (Tr. 47.)  She had not driven an automobile since 2006 because it hurt her back and arms if she drove for too long, and because she had a suspended driver's license.  (Tr. 47.)  Plaintiff went grocery shopping with her children.  (Tr. 48.)  Plaintiff would push the grocery cart; however, they did not spend a long time in the store.  (Tr. 48.)

Plaintiff could not walk a block.  (Tr. 52.)  She could, however, dress herself and take care of her personal hygiene.  (Tr. 49.)  She attended regular conferences with her son's teachers, although she had to be driven to the school by her older children.  (Tr. 51.)  Drs. Bressi, Geiger, and Singh told Plaintiff not to exercise at home because it would cause her to swell.  (Tr. 52.)  They also told her to "keep moving" and do "the regular things" that she did at home such as household chores, but to avoid overexerting herself.  (Tr. 52.)

Drs. Bressi and Geiger told Plaintiff to use a cane and a walker.  (Tr. 53.)  Plaintiff had been using a cane for two years.  (Tr. 55.)  She underwent multiple injections to treat her pain, but the injections did not improve her ability to move and tolerate the pain.  (Tr. 58.)  When Plaintiff began receiving injection treatments, the injections provided relief for approximately two weeks; however, now the injections

---

[2] Plaintiff also testified that she did not return to work after recovering from her surgery because she suffered back pain, could not sit for long periods of time, and could lift only 10 pounds.  (Tr. 40.)

12

provide relief for approximately three days.  (Tr. 58.)

## 2.    The VE's Testimony

The ALJ posed the following hypothetical to the ALJ:

> The first residual functional capacity is at the medium exertional level, lifting
> up to 50 pounds occasionally, lifting or carrying up to 25 pounds frequently.
> Climbing ladders is limited to occasional. Climbing ropes and scaffolds is
> limited to never. Climbing ramps and stairs is limited to frequent.  Also limited
> to frequent is stooping, crouching, kneeling, and crawling.  Overhead lifting
> is limited . . . bilaterally to frequent. And must avoid all exposure to
> unprotected heights.  And work is limited to simple, routine, one to two step
> tasks in a low-stress environment . . . .  [S]uperficial interaction with the
> general public, co-workers and supervisors.  And no strict time or production
> quotas.

(Tr. 77-78.)  The VE testified that such a person could perform Plaintiff's past relevant

work as a fast-food worker, as well as other work in the national economy as a

dishwasher (for which there were 1,200 jobs in northeast Ohio and 500,00 jobs in the

nation), cafeteria attendant (for which there were 1,000 jobs in northeast Ohio and

400,000 jobs in the nation), and telephone order clerk (for which there were 880 jobs in

northeast Ohio and 320,000 jobs in the nation).  (Tr. 78-79.)

The ALJ posed a second hypothetical, as follows:

> It's at the light exertion level, lifting up to 20 pounds occasionally, lifting or
> carrying up to 10 pounds frequently.  Stand, sit, walk each for approximately
> six hours in an eight-hour workday with normal breaks. . . .  [C]limbing
> ladders is limited to occasional. Climbing ropes and scaffolds is limited to
> never.  Limited to frequent is climbing ramps and stairs, stooping, crouching,
> kneeling and crawling.  Overhead reach bilaterally is limited to frequent.
> Mu[st] avoid all exposure to unprotected heights. And the same non-
> exertional mental limitations that I've just given you.

(Tr.  79.)  The ALJ testified that such a person could perform Plaintiff's past relevant

work, the cafeteria attendant and telephone order clerk jobs, and also could perform

work as an "addresser" (for which there were 470 jobs in northeast Ohio and 290,000

13

jobs in the nation).  (Tr. 80-81.)

The ALJ posed a third hypothetical to the VE that was identical to the second except that the hypothetical person also was limited to frequent handling and fingering bilaterally.  (Tr. 81.)  The VE testified that such a person could perform all of the jobs to which he testified in response to the second hypothetical.  (Tr. 81-82.)

The ALJ posed a fourth hypothetical that was identical to the second except that the hypothetical person was limited to sedentary work and could lift up to only 10 pounds occasionally.  (Tr. 82.)  The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform other work as a telephone order clerk, addresser, and reference clerk (for which there were 550 jobs in the local economy and 490,000 jobs in the nation).  (Tr. 82-83.)

The ALJ posed a fifth hypothetical that limited the hypothetical person such that she would be off task 20 percent of the workday in addition to regularly scheduled breaks, or that she would be off task 20 percent of the workweek.  (Tr. 83.)  The VE testified that no jobs in the national economy would be available to such a person.  (Tr. 84.)

Plaintiff's attorney modified the ALJ's fourth hypothetical to include that the hypothetical person could only occasionally handle and finger, and also required an at-will sit/stand option.  (Tr. 84.)  The VE testified that such a person could not perform any work in the national economy.  (Tr. 85.)

Finally, the ALJ asked how the VE's testimony would change if any of the hypothetical people required a cane to ambulate.  (Tr. 86.)  The VE responded that such a person would be precluded from performing light work.  (Tr. 87.)

14

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*

416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Ms. Coontz meets the insured status requirements of the Social Security Act through December 31, 2009.

2.    Ms. Coontz has not engaged in substantial gainful activity since June 28, 2006, the alleged onset date.

3.    Ms. Coontz has the following severe impairments:  fibromyalgia . . . bilateral epicondylitis . . . left sacroiliitis . . . left trochanteric bursitis . . . mild degenerative disc disease with lumbosacral rediculitis . . . generalized anxiety disorder with panic disorder . . . and depressive disorder, not otherwise specified.

4.    Ms. Coontz does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, I find that Ms. Coontz has the residual functional capacity to perform medium work . . . with restrictions. Specifically, she can lift and carry up to 50 pounds occasionally and 25 pounds frequently.  She can never climb ropes or scaffolds.  She can occasionally climb ladders.  She can frequently climb ramps and stairs.  She can frequently stoop, crouch, kneel and crawl.  She is limited to frequent overhead reaching bilaterally. She must avoid all exposure to unprotected heights.  Work is limited to simple, routine, one to two step tasks, in a low stress work environment, where there are no strict time or production quotas. She is limited to superficial interaction with supervisors, co-workers and the general public.

6.    Ms. Coontz is capable of performing past relevant work as a fast food worker.  This work does not require the performance of work-related activities precluded by Ms. Coontz's residual functional capacity.

16

7.      Ms. Coontz has not been under a disability, as defined in the Social
        Security Act, from June 28, 2006 through the date of this decision.

(Tr. 18-29.)

## V.    LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether

the Commissioner's decision is supported by substantial evidence and was made

pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512

(6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of

Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in

the record to determine if the ALJ's decision is supported by substantial evidence,

regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court

does not review the evidence *de novo*, make credibility determinations, or weigh the

evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir.

1989).

The Commissioner's conclusions must be affirmed absent a determination that

the ALJ failed to apply the correct legal standards or made findings of fact unsupported

by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281

(6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a

preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by

substantial evidence will not be overturned even though substantial evidence supports

the opposite conclusion.  *Ealy*, 594 F.3d at 512.

17

**B.      The ALJ's Assessment of Plaintiff's Treating Physicians' Opinions**

Plaintiff contends that the ALJ erroneously failed to account for Dr. Bressi's and Dr. Singh's treatment records that supported their opinions; provided unsupported reasons for giving Dr. Bressi's and Dr. Singh's opinions less than controlling weight, and improperly gave more weight to the opinions of Plaintiff's physical therapist, Mr. Tessean.  For the following reasons, these contentions are not well taken.

An ALJ can consider all the evidence without directly addressing in her written decision every piece of evidence submitted by a party; and an ALJ need not make explicit credibility findings as to each bit of conflicting testimony so long as her factual findings as a whole show that she implicitly resolved such conflicts.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (per curiam) (quoting *Loral Def. Sys.-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir.1999)).  Here, the ALJ noted that Dr. Bressi and Dr. Singh opined that Plaintiff's fatigue prevented Plaintiff from working.  (*See* Tr. 23-24.)  Accordingly, even if the ALJ did not discuss every treatment record from Dr. Bressi and Dr. Singh, it is clear she considered them.

An ALJ must give the opinion of a treating source controlling weight if she finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  Conversely, a treating source's opinion may be given little weight if it is unsupported by sufficient clinical findings and is inconsistent with the rest of the evidence.  *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993).

If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).

Here, the ALJ gave Dr. Bressi's opinions less than controlling weight for the following reasons:

- "Dr. Bressi appears to base his opinion on the effects of [Plaintiff's] fibromyalgia and depression, conditions that he is not principally treating";

- "Dr. Bressi is attributing much of [Plaintiff's] disability to fatigue, which is not well documented in the record, with the exception of only the most recent treatment records of Drs. Bressi and Singh";

- "[I]n December 2008, just the month before Dr. Bressi's opinion, [Plaintiff] reported to Dr. Robb that she was getting only three hours of sleep a night, was engaging in 'high energy' cleaning, and was more active";

- "Dr. Bressi's opinion is also inconsistent with repeated indications in his progress notes that [Plaintiff] was independent in activities of daily living"; and

- "Dr. Bressi's treatment notes also indicate that [Plaintiff's] pain was adequately managed."

(Tr. 23-24.)  The ALJ gave Dr. Singh's opinions less than controlling weight for the following reasons:

- "Dr. Singh appears to base his opinion primarily on the effects of [Plaintiff's] fatigue," but Plaintiff's "complaints of fatigue are not well documented in the record";

- "Dr. Singh's treatment notes indicate that [Plaintiff's] fibromyalgia and carpal tunnel syndrome were stable";

- "On May 14, 2009, Dr. Singh reported that [Plaintiff's] 'fibromyalgia with prominent component of debilitating fatigue' was 'somewhat under control'";

- Plaintiff "requested a letter from Dr. Singh in November 2008 stating that she was unable to work," but "Dr. Singh did not write such a letter, deferring to [Plaintiff's] pain management physician regarding her degenerative disc disease and inability to work"; and

- Dr. Singh's opinion is not supported by his treatment notes and is inconsistent with the evidence as a whole."

(Tr. 24.)

Plaintiff argues that the ALJ inaccurately found that Dr. Bressi did not primarily treat Plaintiff for fibromyalgia and depression.  But the record reasonably supports the conclusion that Dr. Bressi primarily treated Plaintiff's low back pain and degenerative disc disease while Dr. Singh primarily treated Plaintiff's fibromyalgia.

Plaintiff also argues that the ALJ inaccurately concluded that Plaintiff's alleged fatigue is not well documented.  In support of this argument, Plaintiff cites psychiatric treatment notes that show she suffered disturbed sleep patterns.  However, aside from Dr. Bressi's and Dr. Singh's recent treatment notes, Plaintiff's doctors who treated Plaintiff's physical impairments made few, if any, contemporaneous notations of fatigue symptoms.

In short, the ALJ's observations of the record evidence are reasonably supported.  Moreover, the ALJ still found that Dr. Bressi's and Dr. Singh's opinions were inconsistent with their treatment notes and other record evidence such as Plaintiff's activities of daily living.  These are good reason for giving Dr. Bressi's and Dr. Singh's opinions less than controlling weight, and Plaintiff has not taken issue with these findings.

20

Plaintiff also contends that the ALJ improperly relied on Mr. Tessean's opinions, as opposed to Dr. Bressi's and Dr. Singh's opinions, because Mr. Tessean is not an "acceptable medical source."  However, in addition to evidence from "acceptable medical sources," the Commissioner may use evidence from "other sources" to determine whether a claimant is disabled, and physical therapists are considered "other sources."  *See* S.S.R. 06-03p, 2006 WL 2329939, at *1 (S.S.A.).  Information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the individual's impairments and how they affect the individual's ability to function.  *Id.*  Here, the ALJ explained that she gave "substantial weight" to Mr. Tessean's opinion that Plaintiff could perform medium work because "Mr. Tessean is trained in the assessment of work capacity evaluation[,] his opinion is based on objective date," and Plaintiff "appears to have put forth full effort during this evaluation."  (Tr. 22.)  The ALJ further explained that she gave less weight to Mr. Tessean's later opinion that Plaintiff could perform light work because Mr. Tessean stated that light work was only the minimum level of work Plaintiff could perform and Plaintiff did not put forth full effort during the examination.  (Tr. 22.)  The Court finds no defect in the ALJ's assessment of Mr. Tessean's opinions.

Finally, Plaintiff expresses concern that the ALJ viewed Mr. Tessean's opinion more favorably than the opinions of the acceptable medical sources in the record—namely, the opinions of Drs. Bressi, Singh, Kwon, and Leu.  But the ALJ gave good reasons for giving Dr. Bressi's and Dr. Singh's opinions less than controlling weight.  Drs. Leu and Kwon also appear to be treating physicians.  The ALJ explained that she gave less than controlling weight to Dr. Leu's opinions because they were

21

inconsistent with the other record evidence and Dr. Leu did not provide any explanation of the bases for his opinions.  (Tr. 22.)  The ALJ explained that she gave less than controlling weight to Dr. Kwon's opinions because they were inconsistent with the other record evidence, including Dr. Kwon's other treatment notes and reports.  (Tr. 23.) Plaintiff has not taken issue with the ALJ's assessment of Dr. Leu's and Dr. Kwon's opinions; and the ALJ's reasons for giving their opinions less than controlling weight also constitute good reasons.  In short, the record reasonably supports the ALJ's conclusion that Mr. Tessean's opinion that Plaintiff could perform medium work was the most reliable opinion in the record; accordingly, it was not error for the ALJ to rely on that opinion in conjunction with other evidence in the record.

Because the ALJ gave good reasons for giving less than controlling weight to the opinions of Plaintiff's treating physicians, and because the record reasonably supports the ALJ's findings, Plaintiff's contention that the ALJ improperly assessed the opinions of her treating physicians is not well taken.

### C.    The ALJ's Assessment of Plaintiff's Fibromyalgia

Plaintiff contends that the ALJ improperly assessed her fibromyalgia because she did not "differentiate between a pain/symptom analysis and evaluation of fibromyalgia."  (Pl.'s Br. 24.)  Plaintiff explains that "the ALJ's failure to recognize that fibromyalgia may be disabling, in the presence of normal clinical findings, resulted in an erroneous evaluation of the impact of [P]laintiff's fibromyalgia and pain."  (Pl.'s Br. 24.) Plaintiff continues that "the ALJ did not examine whether objective evidence confirmed the severity of the alleged pain arising from the fibromyalgia diagnosis."  (Pl.'s Br. 25) (emphasis omitted).  That is, "after acknowledging the evidence in the record supporting

22

the diagnosis of fibromyalgia, the ALJ utilized a pain standard where objective, clinical findings are required" and, "[a]s a result, [Plaintiff's] fibromyalgia and limitations have not been properly evaluated."  (Pl.'s Br. 25.)

Plaintiff's argument is not clear.  The presence of the objective findings of multiple tender points in this case says nothing about the pain or severity of Plaintiff's fibromyalgia.  The credibility of a claimant's subjective complaints of pain usually is the primary basis upon which to determine the presence and severity of fibromyalgia because fibromyalgia generally cannot be established by objective medical evidence or diagnostic testing.  *See Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003).  The claimant's credibility was a significant issue before the ALJ in this case.  The ALJ found Plaintiff's subjective complaints less than fully credible because the record showed she exaggerate her symptoms, attempted to find work, made inconsistent statements, made statements that were unsupported by the record, and engaged in a wide range of daily activities.  (Tr. 26-28.)  Plaintiff has not taken issue with the ALJ's assessment of her credibility.  In short, Plaintiff has failed to show that the ALJ improperly assessed her fibromyalgia.  Accordingly, this assignment of error is not well taken.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: July 11, 2012

23